**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL PAPER COMPANY d/b/a xpedx<br>6285 Tri-Ridge Blvd<br>Loveland, Ohio  45140 | ) | CASE NO.    **1:11CV910** |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | JUDGE    **D. DLOTT** |
| | ) | |
| v. | ) | **COMPLAINT FOR PRELIMINARY** |
| | ) | **AND PERMANENT INJUNCTIVE** |
| DAVID D. GOLDSCHMIDT | ) | **RELIEF, DAMAGES AND** |
| 72 Endless Vista | ) | **OTHER RELIEF** |
| Aliso Viejo, California  92656 | ) | |
| | ) | |

NOW COMES PLAINTIFF INTERNATIONAL PAPER COMPANY d/b/a xpedx and states for its Complaint against Defendant David D. Goldschmidt ("Goldschmidt") as follows:

<u>PARTIES</u>

1.      International Paper Company ("IP") is a New York corporation that maintains a principal place of business at Memphis, Tennessee.

2.      xpedx, a division of IP, is headquartered in Loveland, Ohio.

3.      xpedx includes two specialty brands, the Strategic Paper Group ("SPG") and Bulkley Dunton Publishing Group ("BD"), (together, "xpedx").  SPG and BD are headquartered in New York City and have offices across the country.

4.      Defendant David D. Goldschmidt was formerly employed by xpedx as a Vice President of SPG.  Upon information and belief, Goldschmidt currently resides at 72 Endless Vista, Aliso Viejo, California 92656 and traveled to Loveland, Ohio on at least two occasions during the past year for xpedx business.



5.      Goldschmidt was employed by xpedx and/or its predecessor from August 2000 until his abrupt resignation, without notice, from xpedx on December 14, 2011.    In 2008, Goldschmidt was promoted to his last position with xpedx as Vice President of SPG, based in Irvine California.  He also functioned as the general manager for the Western Region of SPG and supervised multiple xpedx employees.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) by virtue of the diversity of citizenship of the parties and the fact that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.      Venue lies in this district under 28 U.S.C. § 1391 because events giving rise to xpedx's claims occurred in this district and a substantial part of the trade secrets that are it issue in this action are situated.

## FACTS - BACKGROUND

8.      IP is a publicly held company and is a leading producer of printing papers, industrial and consumer packaging, pulp and recycling products.

9.      xpedx, including SPG and BD, specializes in serving the needs of magazine, catalog and book publishers.

10.      xpedx is IP's North American merchant distribution business and one of the largest distribution companies in the United States.  xpedx delivers innovative solutions and products backed by talented professionals and a robust distribution network designed to deliver excellence to its customers.

2

11.    xpedx services the commercial printing market with printing papers and graphic art supplies, high traffic/away-from-home markets with facility supplies, and various manufacturers and processors with packaging supplies and equipment.

12.    xpedx is a national supplier and distributor of paper, graphics, packaging, and facilities supplies materials, and is the leading wholesale distribution marketer in these customer and product segments in North America, operating approximately 95 warehouse locations and 80 retail stores in the United States, Mexico and Canada.

13.    Among xpedx's significant business assets are its: (1) customers or prospective customers or strategies or data for identifying and satisfying their needs;  (2) product development with vendors; (3) present or prospective business relationships; (4) short and long term strategic plans, acquisition candidates, corporate restructuring plans; (5) products under consideration or development; (6) cost, margin or profit information; (7) human resources (including compensation information and internal evaluations of performance, capability and potential xpedx employees); (8) business methods, databases and computer programs.

14.    In order to maintain its competitive position, xpedx makes significant investments each year to: (a) identify entities that require its services; (b) identify the key individuals responsible for making decisions at those entities; (c) maintain, develop and nurture business relationships with these entities and individuals; (d) learn the business needs of actual and prospective customers; (e) develop innovative solutions to meet actual and prospective customers' needs; (f) set appropriate pricing to attract and maintain actual and prospective customers; and (g) perform other related tasks.

15.    In addition, xpedx works closely with its customers, suppliers and vendors to develop customized products and services to meet its customers' particular specifications.  By

3

developing such long-term relationships, xpedx gains a marketing inroad with the customer, and is able to develop and design customized service packaging that commands a high margin.

16.     The marketing information, customer, supplier and vendor information, and its relationships with its customers are among the principal assets of xpedx's business.

17.     Within the paper distribution industry, marketing information, customer information, supplier, vendor and sourcing information and details regarding a company's relationships with its customers, and comparable data are regarded as confidential and trade secret information.

18.     Such confidential and trade secret confidential information is of significant economic value to xpedx, and would be of significant economic value to competitors in the paper distribution industry.

**GOLDSCHMIDT'S WORK FOR XPEDX**

19.     Goldschmidt's last position with xpedx was Vice President of SPG.

20.     Goldschmidt was highly compensated, receiving not only a salary but also a semi-monthly management stipend and participated in both the xpedx management incentive plan (XIP), an annual incentive plan and the International Paper Performance Share Plan (PSP).

21.     In consideration and as a condition of his employment with xpedx, and access to xpedx's and IP's confidential and trade secret resources, Goldschmidt executed an Employee Agreement Concerning Inventions, Intellectual Property, Confidential information and Conflict of Interest ("Confidentiality Agreement"), pursuant to which he agreed in Paragraph 1 that:

> I agree that I will not publish, use or otherwise directly or
> indirectly disclose (except as directly by IP management) any
> *Confidential Information* owned or possessed by IP or its
> employees during my employment with IP and for a period of 24
> months thereafter.   I understand that (a) IP considers such

4

> *Confidential Information* to be commercially valuable and
> important to its success, (b) disclosure of such information could
> cause irreparable harm to IP, and (c) this restriction is reasonably
> necessary for the protection of IP's business.

22.     In addition, pursuant to Paragraph 2 of the Confidentiality Agreement,

Goldschmidt agreed that:

> When I cease my employment with IP, (a) I will not retain any
> documents containing *Confidential Information* and will promptly
> deliver to IP any such documents that I have in my possession or
> under my control and (b) I will not use any *Confidential
> Information* for my own purposes or for the purposes of others
> either in any future jobs or to create *Inventions or Intellectual
> Property.*

23.     The Confidentiality Agreement defined "Confidential Information" as including,

but not limited to:

> [A]ny information possessed or owned by IP which is not
> generally known to the public, especially if such information gives
> IP a competitive advantage or its disclosure would harm IP. It
> includes, but is not limited to, trade secrets, proprietary
> information and all other information documents or materials,
> owned, developed or possessed by IP or any employee or
> consultant of IP, whether tangible or intangible, relating in any
> way to IP's business and operations, research and development,
> customers, prospective customers, business plans, business
> relationship, products or processes, costs or profit information or
> data from which that information could be derived, human
> resources (including internal evaluations of the performance,
> capability and potential of any IP employee), business methods,
> databases and computer programs.

24.     In turn, the Confidentiality Agreement defined "Inventions or Intellectual

Property" as including, but not limited to:

> [A]nything which can be protected as a trade secret, copyright,
> patent or trademark, whether it arises in the form of a concept,
> idea, invention (whether or not patentable), innovation,
> improvement or discovery and whether it relates to a formula,
> design, product, process, equipment, method of doing business,

manufacturing technique, forestry technique, plant variety, seed of an expression or a writing.

25.     As Vice President of SPG, Goldschmidt was responsible for, among other things, developing and maintaining SPG's relationships with its actual and prospective customers and suppliers and vendors in targeted customer segments, and for maintaining SPG's reputation and goodwill; increasing and maintaining company sales, including overseeing sales team to generate new business; and working with inside sales representatives to track account activities. In addition, he was the direct customer contact for several customers.

26.     At the time of his resignation, Goldschmidt supervised a team of four (4) sales professionals, including, Paul Stuit ("Stuit"), Aaron Taub ("Taub") and Lisa Kutner. He also managed Kristine Henschel ("Henschel"), who managed the customer service team, which at the date of his resignation, included customer service representatives Robin Burr ("Burr"), Thomas Gensler II ("Gensler"), Brian Reimer ("Reimer"), Aaron Zansler ("Zansler"), Craig Dickie ("Dickie") and Debra Lujan ("Lujan"). In his role as a direct customer contact, he worked directly with Henschel, Zansler, Reimer and Gensler to support his customers.

27.     In mid-2011, Goldschmidt was asked to participate as a member of a team addressing one part of the xpedx strategic study. This group of eight (8) managers was tasked with working on xpedx's future strategy for its "direct buy/directed buy" model business (the "Directed Buy Team"). The Directed Buy Team was to develop a process to identify, target and qualify opportunities for business, and identify the skill set and tools needed to identify and develop sales leaders to execute the strategy.

6

28.     This team met on numerous occasions via teleconference, but also met in person at xpedx operations in Chicago IL on August 11, 2011  and in Loveland OH on October 3-6, 2011.

29.     Through his role on the Directed Buy Team, Goldschmidt was exposed to proprietary and/or confidential information not only for SPG and BD, but also all of xpedx. This included information about specific customers and employees to which he otherwise would not have been exposed. In addition, Goldschmidt was involved in interviews or in preparing summaries of interviews of xpedx sales professionals, group vice presidents, sales managers, and customer service representatives to whom he would otherwise have not been exposed. Goldschmidt was also given access to a SharePoint site which contained company confidential information regarding its directed buy strategy.

30.     As a high-level employee of SPG, Goldschmidt had access to other proprietary and/or confidential information, including that regarding marketing information, customer information, including details of Paper Purchase Agreements, strategic plans and details regarding its relationships with its customers, suppliers and vendors.

31.     Paper Purchase Agreements between the xpedx Strategic Paper Group and the purchaser detailed, among other things, confidential, trade secret and proprietary information pertaining to volume commitments, forecasts, indexed-prices adjustments and limits, logistics, trim loss and incentives ("Paper Purchase Agreements").

32.     On or about October 11-14, 2011, Goldschmidt, Taub, Stuit, and another west region sales professional, Paul Stahle ("Stahle") attended a company meeting in Westchester County, New York to discuss the consolidation of Bulkley Dunton and SPG operations. All travel, hotel and expenses of this trip were paid for by xpedx.

7

33.     On or about October 13, 2011, following one session of the meeting, Goldschmidt told the West Region sales professionals he supervised that they were going to have a meeting in his room. At that time, he informed them that he had been in discussions with xpedx competitors Midland Paper Company ("Midland") and Lindenmeyr, and that he wanted to set up a meeting with the four of them and Midland to put together a deal to leave the company, including four (4) of the customer service representatives.

34.     A few days later, Goldschmidt informed the sales professionals he supervised that he had arranged a meeting between them and the principals at Midland in Chicago during the first week of November.

35.      On December 14, 2011, Goldschmidt resigned, without notice, to work for Midland Paper Company ("Midland"), a direct competitor of xpedx. In addition, six former xpedx employees in the SPG division, working under the immediate or second-level supervision of Goldschmidt (Taub, Stuit, Burr, Zansler, Gensler, and Reimer, collectively the "Midland Team") also abruptly resigned, without notice, and, upon information and belief, are also working for Midland in positions substantially similar to their positions at xpedx.

36.     Through his actions in coordinating the meetings, joint job offers and coordinated abrupt departures, he either orchestrated or assisted in orchestrating their abrupt resignations from xpedx and employment with Midland.

## GOLDSCHMIDT'S WORK FOR MIDLAND

37.     Midland is an independently owned paper and packaging distributer which provides printing and imaging papers, publication papers, packaging supplies and equipment, and facility supplies.

8

38.    Midland operates principal distribution facilities in Illinois, Wisconsin and Minnesota. Midland also has sales offices located across the United States to serve book, magazine and catalog publishers.

39.    On information and belief, Goldschmidt is working for Midland as Senior Vice President Midland National, the publishing paper division of Midland, a role substantially similar to that he held at xpedx.

40.    On information and belief, Goldschmidt and his team, on behalf of Midland, are and will continue to be involved in soliciting, contacting and providing services to customers, suppliers and vendors in the paper distribution industry, and will, in performing their respective new jobs for Midland, inevitably use and disclose xpedx's confidential and trade secret information. In addition, Goldschmidt's work on and knowledge of the Directed Buy Team, and other confidential information, of xpedx, will be of significant benefit to Midland, and xpedx will be significantly harmed to have a major competitor led by an individual with knowledge of such information.

41.    On information and belief, Goldschmidt and his Midland Team have communicated with some of SPG's largest customers. Goldschmidt and his Midland Team have relied on pricing, service history and other confidential and trade secret information belonging to xpedx, including information set forth in the Paper Purchase Agreements and identified as such, in an effort to acquire this business.

42.    In light of the foregoing, xpedx and IP will be severely and irreparably damaged if Goldschmidt is permitted to retain xpedx's and IP's information or to use such xpedx trade secret information.

43.    Goldschmidt has recognized the harm involved when a client goes to a competitor noting in his 2011 self-assessment that he "had a few setbacks, which was losing [a music center] to a competitor that was aligned with a consultant."

**COUNT I**
**BREACH OF CONTRACT**

44.    IP realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 46, inclusive, as if fully set forth herein.

45.    IP has performed all conditions precedent required on its part in accordance with the terms of its former employment relationship with Goldschmidt.

46.    As an express condition of his employment and continued employment with IP, Goldschmidt signed the Confidentiality Agreement, agreeing to be bound by the provisions relating to the use and disclosure of its Confidential Information.

47.    The Confidentiality Agreement contains an express provision which requires that Goldschmidt refrain from publishing, using, directly or indirectly disclosing, or retaining IP Confidential Information for non-IP purposes both during and after the termination of his employment with IP.

48.    Goldschmidt has violated and continues to violate his contractual confidentiality obligations to IP by virtue of his employment with Midland, he has engaged and will continue to engage in the solicitation of clients, prospects and employees of IP and otherwise trade on or leverage the relationships or goodwill of IP,  and where they have and will continue to inevitably use or disclose Confidential Information or trade secrets of IP, including, but not limited to, highly-sensitive information pertaining to IP's sales and marketing information, customer

10

information, supplier, vendor and sourcing information, pricing data, and details regarding a company's relationships with its customers.

49.     Goldschmidt's employment with Midland gives Goldschmidt an unfair competitive advantage that irreparably harms the business of IP.

50.     If Goldschmidt was permitted to continue his employment with Midland or solicit customers, prospects of IP for their own account or on behalf of Midland or any other person or entity using IP Confidential Information, they would be using IP's Confidential Information for non-IP purposes and would be causing IP significant damage.

51.     IP cannot place a precise dollar amount on the protection that its confidentiality provisions provide, nor can it place a precise dollar value on the harm IP has or will continue to suffer if Goldschmidt is permitted to evade that protection.

52.     Goldschmidt's actual and anticipated breach of his contractual confidentiality obligations has caused or threatened to cause and will continue to cause or threaten to cause irreparable harm to IP.

53.     In addition to that identified above, the irreparable harm to IP consists of, but is not necessarily limited to, damage to or loss of its clients, prospects or employee goodwill and relations, damage to or loss of its competitive position and loss of current or future business or accounts.

54.     IP has no adequate remedy at law against Goldschmidt.

## COUNT II
### VIOLATION OF THE OHIO UNIFORM TRADE SECRETS ACT, O.R.C. § 1331.61 *ET SEQ*

55.     IP realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 59, inclusive, as if fully set forth herein.

11

56. IP has expended substantial time, money and effort in the development of its confidential, proprietary and trade secret information.

57. Some of IP's confidential, proprietary and trade secret information derives independent economic value (actual or potential) from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from the disclosure or use of this information.

58. This confidential, proprietary and trade secret information is the subject of efforts by IP that are reasonable under the circumstances to maintain the secrecy of the information.

59. Such confidential, proprietary and trade secret information constitutes protectable trade secrets of IP.

60. IP's trade secret information gives IP a competitive advantage in the marketplace.

61. Goldschmidt has a statutory duty to keep secret, and not to disclose or use, the trade secrets of IP.

62. On information and belief, Goldschmidt's employment with Midland has caused, or inevitably will cause, him to disclose or improperly use IP's trade secrets, including, but not limited to, IP's sales and marketing information, customer information, supplier, vendor and sourcing information, pricing data, and details regarding a company's relationships with its customers.

63. On information and belief, Goldschmidt's inevitable disclosure or use of IP's trade secrets on behalf of Midland is proximately causing or will proximately cause injury to IP in violation of Ohio Uniform Trade Secrets Act, O.R.C. § 1331.61 *et seq.*

12

64.     If Goldschmidt is not enjoined from misappropriating or threatening to misappropriate the trade secrets of IP, their conduct will proximately cause further injury to IP in violation of Ohio Uniform Trade Secrets Act, O.R.C. § 1331.61 *et seq.*

65.     If Goldschmidt's actual and/or threatened misappropriation of trade secrets is not enjoined, IP will suffer irreparable harm for which it has no adequate remedy at law.

## COUNT III
### BREACH OF FIDUCIARY DUTY

66.     xpedx incorporates realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 70, inclusive, as if fully set forth herein.

67.     A relationship of trust and confidence existed between Goldschmidt and IP.

68.     Goldschmidt owed fiduciary duties to IP including duties of good faith, honesty, loyalty and full disclosure. Goldschmidt was further duty bound, at all times, to exercise the utmost good faith in the performance of his job duties.

69.     Goldschmidt has breached, or is about to breach, his fiduciary duties by using, disclosing, and being in a position which will result in the unlawful disclosure of IP's confidential, proprietary and trade secret information in breach of his Agreement.

70.     Goldschmidt has breached, or is about to breach, his fiduciary duties by using his position at xpedx to solicit his subordinates to join a competitor, to fail to disclose a business opportunity to xpedx, to hide his plans from xpedx, to fail to report the plans of his subordinates, and to coordinate the abrupt departure of his subordinates from xpedx without notice and in a manner to cause the greatest disruption to xpedx.

13

71.     Goldschmidt has breached, or is about to breach, his fiduciary duties by using, disclosing, and being in a position which will result in the unlawful disclosure of IP's confidential, proprietary and trade secret information in breach of his Agreement.

72.     Goldschmidt has violated, or is about to violate, his fiduciary duties by misappropriating and using IP's confidential, proprietary and trade secret information to the detriment of IP.

73.     Goldschmidt has violated, continues to violate, or is about to violate his fiduciary duty to IP by using and divulging information communicated to him in confidence and/or acquired by him during his employment with IP.

74.     Goldschmidt has violated his fiduciary duties by endeavoring to compete with IP while still in the employ of xpedx.

75.     Goldschmidt has breached his fiduciary duties by using his position at xpedx to move the sales team under his supervision at xpedx systematically from xpedx to Midland.

76.     Under the circumstances set forth above, it is inequitable and unjust for Goldschmidt to be permitted to misappropriate and utilize his inside knowledge of IP's confidential, proprietary and trade secret information to the prejudice and detriment of IP.

77.     As a proximate result of Goldschmidt's breach of fiduciary duties owed to IP, IP has suffered damages in an amount which cannot reasonably be ascertained at present, except that IP avers that said damages exceed $75,000.00.

78.     Unless restrained by this Court, Goldschmidt will continue his unlawful acts and IP will continue to be irreparably harmed.

79.     IP has no adequate remedy at law and is entitled to a preliminary and permanent injunction, enjoining Goldschmidt from further unlawful acts.

14

80.     Goldschmidt's actions are intentional, willful, wanton and reckless and are calculated to harm IP in its business affairs.  As such, IP is entitled to punitive damages.

**COUNT IV**
**BREACH OF THE DUTY OF LOYALTY**

81.     IP realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 84, inclusive, as if fully set forth herein.

82.     As a management employee of xpedx, Goldschmidt owed IP a duty of loyalty.

83.     In violation of that duty, Goldschmidt secretly, corruptly and systematically embarked upon a scheme to use and misappropriate IP's confidential, proprietary and trade secret information.

84.     Goldschmidt breached his duty of loyalty by competing, for his own benefit, with xpedx through his employment with Midland and through the misappropriation of IP's property for his own profit or benefit.

85.     As a proximate result of Goldschmidt's breach of fiduciary duties owed to xpedx and IP, IP has suffered damages in an amount which cannot reasonably be ascertained at present, except that IP avers that said damages exceed $75,000.00.

86.     Unless restrained by this Court, Goldschmidt will continue his unlawful acts and IP will continue to be irreparably harmed.

87.     IP has no adequate remedy at law and is entitled to a preliminary and permanent injunction, enjoining Goldschmidt from further unlawful acts.

88.     Goldschmidt's actions are intentional, willful, wanton and reckless and are calculated to harm IP in its business affairs.  As such, IP is entitled to punitive damages.

15

## PRAYER FOR RELIEF

**WHEREFORE,** IP respectfully requests the following relief against Goldschmidt:

1. Temporary, preliminary and permanent injunctive relief, including, but not limited to, a prohibition on Goldschmidt:

    a. Using or revealing, directly or indirectly, or otherwise making available to anyone for any reason, any Confidential Information of xpedx;

    b. Maintaining employment with Midland, or any other competitor of IP, in any type of direct or sales or customer service capacity similar to that of his former employment with xpedx;

    c. Directly or indirectly soliciting, servicing or otherwise engaging any former or current client or prospect of xpedx with whom he had contact or learned about during his employment with xpedx; and

    d. Directly or indirectly soliciting any employee of xpedx with whom he had contact or learned about during his employment with xpedx to discontinue their relationship with xpedx in favor of engagement with Midland or any other competitor of xpedx.

2. Immediate return of all xpedx Confidential Information and property wrongfully held by Goldschmidt;

3. Judgment against Goldschmidt for all actual, consequential, punitive, special, liquidated and exemplary damages as may be provided by law or contract, including damages for unjust enrichment;

4. Judgment against Goldschmidt for xpedx's costs and reasonable attorneys' fees as provided by O.R.C. § 1331.61 *et seq.* and other applicable law (including, but not limited to, costs and reasonable attorneys' fees as an element of xpedx's damages for Goldschmidt's interference with its actual and prospective contractual relationships);

5. Judgment against Goldschmidt for all interest as allowed by law; and

6. Such other and further relief as this Court deems just and equitable.

16

Respectfully submitted,

Scott A. Carroll (#0062115)
Jackson Lewis LLP
PNC Center, 26th Floor
201 E. Fifth Street
Cincinnati, OH  45202
Tele:  513-898-0050
Fax:  513-898-0051
scott.carroll@jacksonlewis.com


Conrad S. Kee
CN Bar No. #413568
Jackson Lewis LLP
1010 Washington Blvd. 7th Floor
Stamford, CN  06901
*(Pro hac vice pending)*


*Attorneys for Plaintiff*


4843-4285-5950, v. 6

17